36868. F. E. FORTENBERRY & SONS, INC. *v.* MALMBERG.

Decided January 23, 1958—
Rehearing denied February 13, 1958.

*Dunaway & Embry, James M. Embry,* for plaintiff in error.
*A. Russell Ross, T. Emory Daniel, Claude R. Ross,* contra.

QUILLIAN, Judge.  ■ Special ground 1 of the amended motion for a new trial assigns as error the following charge: "The defendants contend that the plaintiff violated those sections that I have just read to you.  The plaintiff denies this and says that she did not violate any of them.  You look to the evidence and see whether or not she did violate any one or all of them.  If you believe she did, then go further and inquire and say whether or not it was the proximate cause of the injuries and if you believe it was the proximate cause of the injuries to the plaintiff, then I charge you that that would be negligence per se because it is in violation of these laws."  The omission of a specific act of diligence prescribed by a valid municipal ordinance or statute constitutes negligence per se, and this is true whether or not it is the proximate cause of a collision.  *Atlanta, K. & N. Ry. Co. v. Bryant,* 110 *Ga.* 247 (2) (34 S. E. 350); *Central R. & Bkg. Co. v. Smith,* 78 *Ga.* 694 (3 S. E. 397).  While the above quoted charge was error, it was harmless because, unless the acts of negligence were either a proximate or contributing cause of the collision, they would have no effect upon the plaintiff's right of recovery.  Code § 105-603.  Special ground 1 is without merit.

■ The defendant insists that there was no evidence that the driver of the truck was acting within the scope of his authority when the collision occurred.  It was admitted by the defendant that Charlie Bufford, the driver of the truck, was employed by it as a driver and that the collision occurred during his normal working hours.  Where an employee, who is employed for the special purpose of operating a truck for his master, is found driving the truck in the usual manner a presumption arises that he is acting within the scope of his authority.  *Fielder v. Davison,* 139 *Ga.* 509 (77 S. E. 618); *Hix-Green Co. v. Dowis,* 79 *Ga. App.* 412 (53 S. E. 2d 601); *Jump v. Anderson,* 58 *Ga. App.* 126 (197 S. E. 644).  This is true because if the employee is not within the scope of his employment, this fact is usually peculiarly within the knowledge of the employer.  It would be hard for the plaintiff to prove that the driver was acting within the scope of his authority while driving the truck.

The presumption that the servant is serving his master within the scope of his employment may, unless supported and corroborated by other evidence, be overcome by uncontradicted evidence.

Where there are circumstances developed by the evidence other than those which gave rise to the presumption from which the jury might legitimately infer that the servant was acting within the scope of his employment the presumption is not overcome as a matter of law even though the master and servant positively testify that what he was doing was without the scope of his employment. The issue is generally one for the jury.

Where as here facts are proved that give rise to the presumption, the burden of evidence on that issue shifts to the master. *Dawson Motor Co.* v. *Petty*, 53 *Ga. App.* 746, 749 (186 S. E. 877). And the evidence adduced by him to overcome the presumption must be clear and positive. *Ableman* v. *Ormond*, 53 *Ga. App.* 753 (6) (187 S. E. 393). The rule is clearly stated in *Minter* v. *Kent*, 62 *Ga. App.* 265, 273 (8 S. E. 2d 109): "Whether the facts and circumstances above enumerated on the question of ownership of the truck and identity of its driver, and as to whether or not he was acting in the prosecution of the defendant's business and in the scope of his employment at the time of the injury, were sufficient to overcome the testimony of the defendants in those respects, were matters for the determination of the jury." On page 272 of the same report is found the pronouncement: "It is well settled that circumstantial evidence may sometimes outweigh positive testimony." In *Ableman* v. *Ormond*, 53 *Ga. App.* 753, 761, supra, it is held: "The basis for the presumption is that it is in general an easy matter to prove the ownership of a car that inflicts an injury, but that whether the car was at the time of the injury being operated in the prosecution of the defendant's business is a matter peculiarly within the knowledge of the defendant, and one on which it is at times exceedingly difficult for the plaintiff to obtain proof. Therefore, if this presumption is to serve its purpose, in order to overcome it as a matter of law the evidence of the defendant should be clear, positive, and uncontradicted that the servant was not at the time in the prosecution of his master's business or acting within the scope of his employment. Thus, testimony of a defendant which tends to show that the driver of the truck was not in the prosecution of the master's business or within the scope of his employment, but is not altogether inconsistent with or antagonistic to the prima facie case made, and does not within itself affirmatively

establish facts to show that the servant was not in the prosecution of his master's business or acting within the scope of his employment, is not sufficient, as a matter of law to overcome the presumption." We also cite *Frazier* v. *Southern Ry. Co.*, 200 *Ga.* 590 (37 S. E. 2d 774). One of the main elements of proof in showing that a servant is acting within the scope of his employment is that what he does is at his master's direction and under his master's control. 35 Am. Jur. 985, § 552.

The defendant, to disprove the presumption, offered the testimony of its manger, Elmo Fortenberry, and the employee, Charlie Bufford, who was operating the truck when it collided with the plaintiff's automobile. The manager, Fortenberry, testified: "Q. Your name is Elmo Fortenberry? A. That's right. Q. What is your relationship with the corporation, F. E. Fortenberry and Sons, Incorporated? A. Member of the board of directors and vice-president. Q. What part of the business do you actively participate in? A. Building, supply and hardware. Q. Was Charlie Bufford formerly one of your drivers there in the building, supply end of the business? A. That's right. Q. How long had he been working for you at the time this collision happened that we are talking about? A. Approximately three years. Q. Do you recall a collision on August 29, 1955, between Mrs. Ann Malmberg's car and one of your trucks being driven by Charlie Bufford? A. Yes, sir. Q. Do you know what or where Charlie was going with the truck at that time? A. Going down to his house. Q. Did he ask you permission to use the truck or did you extend it to him or how did that come about? A. I let him have the truck. Q. For what purpose? A. Carry some lumber down to his house. Q. Where did the lumber come from? A. Out of the yard. Q. Out of the lumber yard? A. Yes. Q. Was it part of the building that was being wrecked? A. It was some material that I had in the yard there. Q. Had you given Charlie some scrap lumber or other materials before that and allowed him to take it home in the company truck? A. At times, yes, sir. Q. This occurred during working hours; I believe that is stipulated? A. That's right. Q. Did you or not make a practice of giving surplus materials or materials that you didn't particulary want to your employees? A. At times; it wasn't a habit though; he just particularly asked for that particular pile of

material I had there. Q. You had given things like that to other employees other than Charlie, had you not? A. Nothing except the men working directly with the store. Q. But you knew where Charlie was going and what he was doing in the truck at the time this thing happened? A. Yes, sir."

The driver, Charlie Bufford, testified: "Q. Your name is Charlie Bufford? A. Yes, sir. Q. Did you formerly work for F. E. Fortenberry and Sons, Incorporated? A. That's right. Q. What part of the business did you work for out there? A. I drove a truck for them. Q. For the building and supply end of the business? A. Yes, sir. Q. Who was your supervisor there? A. Elmo Fortenberry. Q. Do you recall the occasion on August 29, 1955, when you had a collision with one of the Fortenberry's trucks with Mrs. Ann Malmberg's automobile? A. Yes, sir. Q. On that occasion, where were you going with the truck at the time of the collision? A. He gave me permission to take some lumber down to my house; he had torn down the building; he told me I could take it down to my house. Q. Did you pay him anything for the lumber? A. No sir; he gave it to me. Q. Had he given you things before? A. Yes, sir; he has. Q. Did you consider that as part of your pay? A. No, sir. Q. He did that quite frequently, give you things like that and give you permission to take them home in the truck? A. Yes, sir. Q. What time of day did this collision happen? A. I believe it was around 5:30 o'clock or something like that. Q. What time did you get off work? A. 6 o'clock. Q. Was it your understanding that you were to take this stuff home and then come back to work? A. Yes, sir. Q. On that particular day did you ask Mr. Fortenberry for the lumber that you were carrying home? A. He was going to burn it up or do something with it, so I just asked him could I have it. Q. He gave you the lumber? A. Yes sir. Q. Then you asked him if you could use the truck to take it home? A. That's right. Q. Did you have anything else on the truck at that time besides that lumber? A. That's all. Q. Were you making any delivery for the Fortenberry's at that time? A. No, sir. Q. You were going to take that on home and come back and bring the truck back; is that right? A. Yes, sir. Q. Did you live on Smith Street at that time? A. No, sir; it was Clark Street I stayed on. Q. Does that run off Smith Street? A. Yes, sir. Q. You had to go down Smith to get

to your home? A. That's right. Q. At that time you had nothing there on the truck to deliver for Fortenberry's, did you? A. No, sir."

One vital fact testified to by the driver, Charlie Bufford, was that the defendant manager "was going to burn the scrap lumber or do something with it" and that upon his request the manager gave him the lumber and permitted him to haul the same to his home on the defendant's truck.

From the testimony of both the defendant manager and driver the inference was warranted that the scrap lumber was given to the driver and he was allowed to carry the same to his home on the defendant's truck for the purpose of engendering good managerial and labor conditions between the defendant and the driver.

In the case of *Starr & Sons Lumber Co.* v. *York*, 89 *Ga. App.* 22, 28 (78 S. E. 2d 429) it was held: "Our concept of employment, particularly on the level of McBride's employment, inherently involves orders and control. To our minds, it is clear, under all the evidence disclosed by this record, that McBride was following a custom of taking blocks of wood home for use as firewood, such blocks being taken in a truck belonging to the defendant, taken with the knowledge and consent of the defendant, and that such favors were, according to competent testimony, to good workers who had been with the company for a long time and who had been faithful to the company. Erwin, an official of the Starr Lumber Company, testified that this was done to 'Keep them [the employees] satisfied and keep their good will, and to keep them working . . . we let him [a faithful worker] have them [the wooden blocks], and sometimes, if he is a good worker, we let him have the truck to carry them home with him.' That testimony places McBride as a good worker, who is given wood and a truck in which to take the wood home as an inducement to 'keep them satisfied', an objective desired by most employers and for which employers are usually willing to pay, in the instant case, not alone with wages, but by giving employees wood and a truck in which to take the wood home."

As pointed out in *Starr & Sons Lumber Co.* v. *York*, 89 *Ga. App.* 22, supra, this was a matter connected with the promotion and conduct of the defendant's business.

The proof of the facts above referred to unexplained by the defendant's testimony was sufficient to support the inference that the scrap lumber that was being hauled by the defendant was refuse or at least that the defendant desired to remove it from the lumber yard in order to be rid of it. The proof of the facts referred to considered with the evidence that the truck was not merely loaned to the servant so as to place it in his exclusive control as in the case of *Fielder* v. *Davison,* 139 *Ga.* 509 (5), supra, but that the servant was directed by the manager to where he was to carry the lumber on the defendant's truck and that the hauling was being done during working hours, were circumstances that the jury might consider and were sufficient to carry the issue to the jury as to whether the servant was acting in connection with and within the scope of his employment when the truck collided with the plaintiff's automobile. In this connection it should be observed that so far as the record reveals the purpose of the manager in having the lumber removed from the yard and hauled away was exclusively within the knowledge of the defendant and its employees.

(b) The defendant insists that the evidence does not support the verdict because it discloses that the plaintiff did not exercise ordinary care for her own safety, and further that there was no evidence that its employee was negligent.

The plaintiff testified in part that: she was traveling on Montreal Street in the direction of Clarkston; the defendant's truck pulled out of a side street in front of her; it was approximately 150 feet to the next intersection when she pulled her automobile to the left to ascertain if there was any traffic approaching; there was no traffic approaching nor were there any automobiles parked on the street or pedestrians walking in the street; she blew her horn and started around the truck when she saw the way was clear; she looked at the rear of the truck before attempting to pass, and the driver gave no turn signals; if the driver gave a turn signal after she became abreast of the truck she would not have been able to see it; the truck was near the outer edge of the street and there was ample space for passing; the truck was traveling at approximately 15 miles per hour; as she came abreast of the cab of the truck it turned into her causing a collision; she was putting on brakes and blowing her horn at the time; she

looked but did not see the driver of the truck give any signal as she began to pass the truck; the collision occurred approximately 30 feet from the intersection.

The testimony of the plaintiff authorized the jury to find that the defendant's driver was negligent and that this negligence was the proximate cause of the collision.

For the sake of verity and clarity, the testimony of the plaintiff relative to the manner in which the collision occurred is here set forth: "I was going up Montreal towards Clarkston, towards the main street of Clarkston and Mr. Fortenberry's truck pulled out of a little side street in front of me and was going on ahead and I came up to him and it was about 150 feet from Smith Street, approximately that much, and I pulled out to the side to see if there was any traffic ahead; well, there was no traffic ahead; there was no cars parked on the street; there wasn't anybody walking down the street, so it couldn't have been safer. I blew the horn and started around him when I saw that it was clear. He was way over to the side of the street. There is actually room for three cars on the street. He was way over on the right and he gave no indication whatsoever of turning. Now he was going very very slow, about 15 miles an hour, I believe it was. As I got up about just about the cab of the truck, he could have seen me through the rear view mirror, and he started this way; I started putting on my brakes; I put on my brakes when I saw him start to pull over; that was about 30 feet from Smith Street, and he just pulled on into me and I, of course, stepped on my brakes, and I was blowing my horn at the same time, but he continued to come into me and we had an accident. It's a double seat and my little boy was thrown up under the car and knocked the radio off as he went down under it; everything was down in front of the car and everything was broken in there and I must have been knocked out for a minute; of course, my most concern would have been for Michael. Q. How fast were you going at the time you started around this truck? A. I was going around 20 miles an hour and that is why it took me so long; if I had been going fast, of course, I could have gotten around faster, I imagine. Q. Did you at any time see a blinker signal or an arm signal or any other type of signal of the driver's intention to turn to the left or slow down? A. No, sir. Q. Were you in a position before

you started around the truck when you were behind it, to have seen a blinker or signal or arm signal, if one had been given? A. That is the thing I do, look for, and I look for first to see if there is any intention of them making a move before I make a move. Q. Where were you in relation to his truck when you first blew your horn to give him a signal of your intention to pass on his left? A. I was in back; I had pulled out just a little like this to look and see if everything was clear ahead and when I saw it was, I picked up my speed to go around him; then I blew my horn right when I thought I am passing; then I blew my horn. Q. But you were still to the rear of his truck? A. Yes. Q. What part of his truck hit what part of your automobile? A. It was the right front part of the car; the left part of his truck hit the right front of my car. Q. How far did you go when the two vehicles collided? A. We didn't go anywhere, not that I can remember; we just hit. Q. You didn't stop dead still, did you? A. No; we traveled a little way over; since I was beside him, it put me more into Smith, more to the edge of Smith Street; like this was the edge, I was sitting on the outer edge past Smith Street. Q. Was this a mild collision or violent? A. Very violent. Q. What did it do to you inside the car? A. Like it knocked me out at first, and of course, when I got back my senses, I saw about Michael, and I was comforting him more or less, and I just didn't know what to do and I wasn't thinking very straight, because it was so violent. Q. Did you hear what he said to the policeman and what the policeman said to him? A. Yes; he come up there to the car and asked him if this other man said that he did see the accident, and the policeman said, Yes, he did, but he is drinking and we won't take his word, and I told the policeman that he didn't see the accident; I told him exactly what had happened, and my husband asked him had he made a case against Fortenberry, the driver, and he said, no, I didn't because your wife said that she didn't know whether he gave a signal or not, and I said, No, sir; I didn't say that; I said that he said he gave a signal and I said that he gave no signal and that I had given a warning and that there was no signal as far as I could see, not by hand or by blinker and that if he did give a signal when I was passing the back of his truck, then it would have been impossible for me to see it. Q. So that you and the truck

both were traveling along, I believe you said, you were going about 20 miles an hour and he was going about 15? A. I wasn't going 20 before I passed him. Q. How fast were you going before you passed him? A. I was right behind him so I would have been going less. Q. Did you follow him along for a while at 15 miles an hour? A. Yes, sir; see where the street pulls into Montreal, he pulled out in front of me, so of course, I came in behind him and he was going very slow and I pulled out to see if it was all right to pass him. Q. Is Montreal Street the same width all the way to the main street or does it get wider up there near Smith Street? A. Now it gives sort of an illusion that it's wider, at that point, but the thing that causes it, the telephone poles and trees over there. Q. Do you have any trouble with your eyes? A. No, sir. Q. Your eyes are all right? A. Yes, sir. Q. So far as you know it's wider up towards Smith Street on up to Main street; is that right? A. It wasn't really; it just gives the illusion of being. Q. This truck turned into Montreal Street from your right, didn't it? A. Yes, sir. Q. It was going to turn left into Smith Street, wasn't it? A. Yes, sir. Q. And it's possible for a car to be parked on one side and still have two lanes of traffic there, is that right? A. Yes, sir. Q. Room for three cars? A. Yes, sir. Q. The street is about 20 feet wide at that point, isn't it. A. I couldn't say for sure. Q. As you went along behind this truck, how far from Smith Street were you when you first caught up with it? A. I caught up with him just as he pulled out in front of me onto Montreal. Q. When you say you caught up with him, do you mean you pulled up beside his right after he pulled out of this street on the right? A. No, sir; I don't ever just start to pass anybody like that. Q. When did you first pull out beside the truck? A. When he pulled out in front of me onto Montreal and of course that made him right in front of me and I looked out and just as I looked, pulled the car over to look out to see if it was clear up ahead. Q. In other words, you waited until he straightened up before you started to pull out? A. Yes; I wasn't going to even pass him then until I saw how slow he was going. Q. He was going very slow at about 15 miles an hour, I believe you stated? A. I didn't mean that is very slow; but I mean slow. Q. Would 15 miles an hour be about right? A. Yes, sir. Q. When you started to go around

him, at what speed were you traveling? A. Around 20. Q. How far back from Smith Street were you at the time you pulled out to go around him? A. I was about 150 feet, between 150 and 200 feet. Q. At that time you could see perfectly level up there and you could see Smith Street where it came in? A. I don't know that it's a street exactly; you could see the telephone poles, the houses facing that way, so there must have been a street. Q. It was level enough at least for you to see whether or not it was clear at that point; is that right? A. Yes, sir. Q. That was about 150 or 200 feet back from Smith Street when you pulled out to go around him? A. Approximately, I am approximating. Q. Using these two Bibles in illustration, I am trying to find out just exactly what happened when the truck pulled out onto Montreal and straightened up on ahead headed south on Montreal, the same truck you were following, and he was in front of you and you were going like that? A. Yes, sir. Q. And he was going about 15 miles an hour? A. Yes. Q. Then I want to know about how far from the front of your automobile to the rear of the truck were you traveling? A. About a car length. Q. You were driving what type of automobile. A. '51 Ford. Q. That would be about 15 feet long, wouldn't it? A. I don't know. Q. It's just about as long from where you are to where I am counting it from bumper to bumper? A. If I could stand to the side and look I could probably tell; that is about right, I imagine. Q. In other words, from bumper to bumper on a 1954 Ford? A. No; '51 Ford. Q. Well, that's a little shorter, but it would be about the length of this rail from bumper to bumper, wouldn't it? A. No, sir; it isn't that long. Q. So you followed him then for some distance even closer than the length of that rail immediately behind him, is that right? A. Yes, that's about the length it was how far I was behind him. Q. Then you pulled out to go around him when you were about 150 or 200 feet? A. No, sir; I didn't pull out to go around him; I pulled out to see if it was all right to go around him. Q. Did you ever pull in behind him again or did you stay out there? A. No, sir; I didn't; if it hadn't been all right, I would have just pulled back over there. Q. After you pulled out the first time? A. I saw it was all right. Q. When you saw it was all right, you didn't pull back in behind him after you pulled out on that side, is that right? A. Yes, sir. Q. Then you proceeded

to very slowly overtake him because you said you were going about 20 miles an hour; is that right? A. When we had the accident I was going about 20, but I had to pick up speed to get around him. I was going about 15 miles an hour. Q. When you first pulled out? A. Yes, sir. Q. Did you accelerate your car after you pulled out and saw it was clear? A. Yes, sir. Q. How fast did you get then? A. I started going about 20. Q. Did you maintain the speed of about 20 on up to the time the accident occurred? A. I had just maintained about 20 when I saw that we were going to have an accident; in other words, I was going about 15 behind him and then I gathered speed up to about 20 within 30 feet of Smith. Q. Was 20 miles per hour the maximum speed that you ever attained from the time you pulled out from behind him? A. Yes, sir. Q. I believe you stated you pulled out about 150 or 200 feet from Smith Street? A. Approximately. Q. You never accelerated the car any faster, but you just gradually went up like that for a while you were traveling almost side by side, weren't you? A. No, sir; you always get around anybody as fast as I can. Q. I am talking about on this occasion? A. This case too, I was going to get around him, of course, as fast as I could, but like I said, I didn't start to pass him just as he turned into Montreal, but I gathered speed; I didn't just step on the accelerator and shoot; you know what I mean, but I was passing him as quickly as I could. Q. But the maximum speed that you ever attained was 20 miles an hour; is that right? A. That's right. Q. Would your car run faster than 20 miles an hour? A. I imagine it would. Q. When you put on the brakes, did you slide the tires? A. Yes, sir. Q. How far did you slide them? A. Until we had the accident; I think it was about 30 feet. Q. You slid your tires before you struck the truck? A. Yes sir. Q. You actually ran into the left rear wheel of the truck, didn't you? A. No, sir; it was the front of the car; he moved the car. Q. The left rear wheel didn't come in contact with your car? A. The car bounced back like this against it; so it could have bounced back against the left rear wheel. Q. This Fortenberry truck was driven by a colored man by the name of Charlie Bufford; isn't that right? A. Yes, sir. Q. And Charlie was going down to Smith Street in the truck at that time, wasn't he? A. I didn't know at that time he was going to Smith Street.

Q. You found out that it was Smith Street? A. Yes, sir. Q. For a distance of 150 or 200 feet, you never accelerated your car any faster than 20 miles an hour as you approached Smith Street so that you could get around before you got to Smith Street, did you? A. That is what I was trying to do; of course, I wasn't looking at the speedometer every moment; I looked to be sure; I wasn't looking at the speedometer every moment, but I was not going fast enough to have gotten around him in that time and since when I saw the accident was going to happen, I looked down and it was 20; that is what I am basing it on. Q. I believe you said you skidded the tires on your car for about 30 feet before the collision? A. No. sir; that was including the collision. Q. So that you were laying down skid marks with all four wheels when you went into the truck and then your car veered around to the left of the Fortenberry truck even further into Smith Street, did you not? A. No, sir; you see he hit me actually it was on the other side of Smith Street and my car veered back like this when it hit the car in front, of course, and he hit mine in front; then it kind of knocked back like this; I don't mean my car kept going; it just bounced off, I guess. Q. You didn't go to a hospital from the scene of the accident, did you? A. No, sir. Q. In fact Mr. Fortenberry carried you and Michael home in his truck, didn't he? A. And my husband. Q. You said 20 miles per hour was the maximum speed that your car ever got up to and that the truck was going about 15 miles per hour and immediately before the collision, you applied your brakes? A. When I saw the first hint of an accident, I immediately started applying my brakes and blowing my horn. Q. Were they good brakes? A. Yes, sir. Q. Skid all four wheels? A. I don't know. Q. You hadn't had any trouble with the brakes; you know that you laid down skid marks for 30 feet? A. I was going by the report; yes, sir. Q. When you went into the side of the truck, you had cut the speed of your automobile down considerably then from 20 miles an hour by applying the brakes? A. If they were skidding, I was still going; I don't know. Q. It was slowing down when you applied the brakes though, wasn't it? A. Yes sir."

While it is true the plaintiff was guilty of negligence per se in driving her vehicle to the left side of the roadway within 100 feet of an intersection (Code, Ann., § 68-1637 (b)), this negligence

would not preclude a recovery by the plaintiff if the jury determined that she could not have avoided the consequence of the defendant's negligence by the exercise of ordinary care after it was actually discovered or should have been discovered by a like degree of prudence on her part. *Willis* v. *Jones*, 89 *Ga. App.* 824, 825 (81 S. E. 2d 517).

The rule is well stated by Judge Townsend in a well considered opinion, *Conner* v. *Downs*, 94 *Ga. App.* 482 (2) (95 S. E. 2d 393) "That a plaintiff is guilty of ordinary negligence will not bar recovery where it precedes any duty on his part to discover and avoid the negligence of the defendant, but it will bar recovery where it appears that it is the sole proximate cause of injury, or where by the exercise of ordinary care he might have avoided the defendant's negligence after it became apparent to him, or where by the exercise of such care he might have detected negligence on the part of the defendant, which had it been detected, could by ordinary care have been avoided. Negligence of the plaintiff not falling into one of these categories which concurs with negligence of the defendant in proximately causing the injury, but which does not equal or exceed the negligence of the defendant, goes in mitigation but not in bar of the recovery. The charge of the court on this subject was not subject to the assignments of error urged against it."

The rule is not altered by the facts that the plaintiff's negligence, if she was negligent, was in violation of a public statute and hence was negligence per se. *Georgia Ry. &c. Co.* v. *Reid*, 26 *Ga. App.* 720 (2) (107 S. E. 100).

*Judgment affirmed. Gardner, P. J., Townsend, Carlisle and Nichols, JJ., concur. Felton, C. J., dissents.*

FELTON, Chief Judge, dissenting. The plaintiff in this case not only did not prove that an act of negligence of the driver of the defendant's truck was the proximate cause of the injuries and damage, but the evidence showed conclusively that the plaintiff is barred from recovery by reason of her own negligence. The evidence indisputably shows that the plaintiff was attempting to pass the defendant's truck on the left at an intersection as the truck driver was making a left turn into another street, following and next to the truck for approximately 150 feet. There was no evidence that the truck driver's failure to give a left-turn

signal was the proximate cause of the collision. The plaintiff testified that she pulled up on the left side of the truck and almost to its cab before the collision; therefore, even if the truck driver had given or failed to give a left-turn signal by blinker light, it would not have influenced the plaintiff's conduct. Besides, the truck driver was the plaintiff's witness, and he testified that he gave a left-turn signal by a blinker light before turning, and the plaintiff admitted that if he had done so while she was on his left and almost to the cab of the truck, she could not have seen it. Furthermore, the plaintiff was violating the law in passing at an intersection and in so doing she was charged with the duty to anticipate that the truck driver would also violate the law by failing to give a left-turn signal. *Anderson* v. *Williams*, 95 *Ga. App.* 684 (3) (98 S. E. 2d 579); *Ga. Power Co.* v. *Blum*, 80 *Ga. App.* 618 (3b) (57 S. E. 2d 18).

There was no evidence that the truck driver looked into the rear-view mirror and ascertained that the plaintiff was about to pass him and could have thereafter avoided the collision. There was no evidence that the plaintiff blew her horn a sufficient distance behind the truck to give reasonable warning of her intention to pass before reaching the intersection.

I think that the motion for a judgment notwithstanding the verdict should have been sustained. The majority opinion merely assumes that the defendant was negligent. It does not point out what evidence in the case authorizes such an assumption.